*ORIGINAL*

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 23 2019 ★

LONG ISLAND OFFICE

UNITED  STATES  DISTRICT  COURT
EASTERN  DISTRICT  OF  NEW  YORK

**MATSUMOTO, J.**

**BULSARA, M.J** COMPLAINT

SHAUN  GOODALL,

                    Plaintiff,

      v.

**JURY  TRIAL  DEMANDED**

No.: **CV19-532**

NEW   YORK   STATE   DEPARTMENT   OF   CORRECTIONS   AND   COMMUITY
SUPERVISION, COMMISSIONER  ANTHONY  ANNUCCI,  ASSISTANT  COMMISSIONER  BRYAN
HILTON,  SUPERINTENDENT  BRANDON  SMITH,  DEPUTY  SUPERINTENDENT  MARIE
HAMMOND,  ASSISTANT  DEPUTY  'SUPERINTENDENT  LAURIE  FISHER,  FACILITY
HEALTH  SERV.  DIRECTOR  DOREEN  SMITH,  REHABILITATOR  COORDINATOR  .L.
MARDON,  REHABILITATOR  COORDINATOR  L.  O'HARA,  REHABILITATOR  COORDINATOR
A.  CLUEVER,  REHABILITATOR  COORDINATOR  M.  NORIEGA,  REHABTIITATOR
COORDINATOR  WELYTOK,

                    Defendants,

------------------ -----------------------X

**RECEIVED**

JAN 23 2019

**EDNY PRO SE OFFICE**

        Plaintiff, Shaun Goodall, appearing <u>pro se</u>, as and for his
complaint against Defendants, alleges the following:

RECEIVED

JAN 24 2019

PRO SE OFFICE

## I. JURISDICTION AND VENUE

     1.   This  is  a  civil  action  seeking  relief  and/  or
damages,  authorized  by  Title  II  of  the  Americans  with
Disabilities  Act  of  1990  (42  U.S.C.  12101,  et  seq.),  and
the  New  York  State  Human  Rights  Law  (N.Y.  Exec.  Law  §
290  et  seq.)  to  redress  violations  of  those  Acts.

The Court has jurisdiction over the action under 28 U.S.C. §1331, 1343(4) and 2201.   The Court also has supplemental jurisdiction over Plaintiff's State Law claims under 28 U.S.C. §1367.

2.   The Eastern District of New York is an appropriate venue under 28 U.S.C. §§ 1391 (b)(1), (c)(2), and (d), because defendant New York State Department of Corrections and Community Supervision resides in the State of New York and its contacts with the Eastern District of New York would be sufficient to subject it to personal jurisdiction if that district were a separate State.

## II. PLAINTIFF

3.   Plaintiff, S-haun Goodall, is and was at all relevant times mentioned herein, an inmate of the State of New York in the custody of New York State Department of Corrections & Community Supervision. He was released from incarceration on December 26, 2018, and currently resides at 15 Koren Lane, Middle Island, New York 11953. However, this is only a physical address. Plaintiff receives mail at P.O. Box 48, Wantagh, New York. III. DEFENDANTS 11793.

4.   Defendant New York State Department of Corrections and Community Supervision is a State Agency organized and existing under the laws of the State of New York and maintains sufficient contacts with the Eastern District of New York.

4a.   Defendant, Anthony Annucci, functions as the Commissioner of New York State Department of Corrections & Community Super-vision (henceforth, NYSDOCCS) and is employed at the Harriman State Campus, Building 2, 1220 Washington Avenue, Albany, New York, 12226.

5.   Upon information and belief, Mr. Annucci, in his individual capacity, was and is at all relevant times herein, the Commissioner of NYSDOCCS.   He is legally responsible for the overall

operations and policies of the Department and in each institut-
ion under its jurisdiction, including Greene Correctional Facil-
ity (henceforth, Greene C.F.).

6. Defendant, Bryan Hilton, functions as the Assistant Comm-
issioner of NYSDOCCS and is employed at the Harriman State Camp-
us, Building 2, 1220 Washington Avenue Albany, New York 12226.

7. Upon information and belief, Mr. Hilton, in his individ-
ual capacity, was and is at all times herein, the Assistant Comm-
issioner of NYSDOCCS. He is legally responsible for the operat-
ions and policies of the Department and each institution under
its jurisdiction, including Greene C.F.

8. Defendant, Brandon Smith, functions as the Superintendent
of Greene C.F. and is employed at 165 Plank Road, Post Office Box
975, Coxsackie, New York 12051.

9. Upon information and belief, Mr. Smith, in his individual
capacity, was and is at all relevant times herein, the Superin-
tendent of Greene C.F.. He is legally responsible for the manag-
ement of subordinates as a Supervisor, and for the decisions,
conduct, and behavior of all employees under his command. He has
authority to remedy any matter of impropriety. Mr. Smith is also
directly responsible for rendering decisions on grievance com-
plaints submitted by the inmate population.

10. Defendant, Marie Hammond, functions as the Deputy Super-
intendent of Programs at Greene C.F. and is employed at 165 Plank
Road, Post Office Box 975, Coxsackie, New York 12051.

11. Upon information and belief, Ms. Hammond, in her individ-
ual capacity, was and is at all relevant times herein, the Deputy

-3-

Superintendent of Programs of Greene C.F.  She is legally re-
sponsible for ensuring proper placement in programs or services
for eligible and qualified inmates so that they may benefit from
its rehabilitative components.

12.  Defendant, <u>Laurie Fisher</u>, functions as the Assistant
Deputy Superintendent of Programs at Greene C.F. and is employed
at 165 Plank Road, Post Office Box 975, Coxsackie, New York 12051.

13.  Upon information and belief, <u>Ms. Fisher</u>, in her individ-
ual capacity, was and is at all relevant times herein, the Ass-
istant Deputy Superintendent of Programs of Greene C.F.  She is
legally responsible for ensuring proper placement in programs or
services for eligible and qualified inmates so that they may ben-
efit from its rehabilitative components.

14.  Defendant, <u>Doreen Smith</u>, functions as the Facility
Health Services Director at Greene C.F. and is employed at 165
Plank Road, Post Office Box 975, Coxsackie, New York 12051.

15.  Upon information and belief, <u>Ms. Smith</u> in her individ-
ual capacity, was and is at all times relevant herein, the Fac-
ility Health Services Director of Greene C.F.  and is a licensed
Medical Doctor/ Provider, and in her official capacity is a Med-
ical Doctor/ Provider at Greene C.F.  Her duties consist of, but
are not limited to, evaluating inmate's health, assessing disib-
ilities, and rendering decisions relating to reasonable accomod-
ations for individuals with serious medical needs or disibilities.

16.  Defendant, <u>L. Mardon</u>, functions as a Senior/ Supervising
Offender Rehabilitator Coordinator at Greene C.F. and is employed
at 165 Plank Road, Post Office Box 975, Coxsackie, New York 12051.

17. Upon information and belief, <u>L. Mardon</u>, in his/ her in-
dividual capacity, was and is at all relevant times herein, one
of the Senior/ Supervising Offender Rehabilitator Coordinators of
Greene C.F. His/ her duties consist of, but is not limited to,
coordinating rehabilitative efforts to ensure eligible and qual-
ified inmates benefit from programs or services through screening
and suitability and overseeing the conduct and behavior of sub-
ordinate Offender Rehabilitator Coordinators (henceforth, O.R.C.).

18. Defendant, L. <u>O'Hara</u>, functions as a Senior/ Supervising
O.R.C. at Greene C.F. and is employed at 165 Plank Road, Post Off-
ice Box 975, Coxsackie, New York 12051.

19. Upon information and belief, L. <u>O'Hara</u>, in her individ-
ual capacity, was and is at all relevant times herein, one of the
Senior/ Supervising O.R.C.'s of Greene C.F. <u>L. O'Hara's</u> duties
consist of, but is not limited to, coordinating rehabilitative
efforts to ensure eligible and qualified inmates benefit from
programs or services through screening and suitability and over-
seeing the conduct and behavior of subordinate O.R.C.'s.

20. Defendant, <u>A. Cluever</u>, functions as an O.R.C. at Greene
C.F. and is employed at 165 Plank Road, Post Office Box 975,
Coxsackie, New York 12051.

21. Upon information and belief, <u>A. Cluever</u>, in her indiv-
idual capacity, was and is at all relevant times herein, an
O.R.C. of Greene C.F.. <u>A. Cluever</u>'s duties consist of, but is
not limited to, coordinating rehabilitative efforts to ensure
eligible and qualified inmates benefit from programs or services
through screening and suitability.

22. Defendant, <u>M. Noriega</u>, functions as an O.R.C. at Greene

C.F. and is employed at 165 Plank Road, Post Office Box 975, Coxsackie, New York 12051.

23. Upon information and belief, M. Noriega, in her individual capacity, was and is at all relevant times herein, an O.R.C. of Greene C.F.. M. Noriega's duties consist of, but is not limited to, coordinating rehabilitative efforts to ensure eligible and qualified inmates benefit from programs or services through screening and suitability.

24. Defendant, Ms. Welytok, functions as an O.R.C. at Greene C.F. and is employed at 165 Plank Road, Post Office Box 975, Coxsackie, New York 12051.

25. Upon information and belief, Ms. Welytok, in her individual capacity, was and is at all relevant times herein, an O.R.C. of Greene C.F.. Ms. Welytok's duties consist of, but is not limited to, coordinating rehabilitative efforts to ensure eligible and qualified inmates benefit from programs or services through screening and suitability.


## IV. PREVIOUS LAWSUITS BY PLAINTIFF


26. Plaintiff has filed no other lawsuit in State or Federal court dealing with the same or similar facts involved in this action.


## V. FACTUAL ALLEGATIONS

27.   Plaintiff commences this Civil Rights Action against
the Defendants mentioned in paragraphs (4) to (25), whereby
Plaintiff's Federal and State Rights were repeatedly violated;
namely by aggravated acts of disability discrimination in relation
to the Defendants' adherence to unlawful policy and custom in
denying qualified inmates with disabilities the benefits of
program participation/ completion without reasonable
accomodations, resulting in excessive confinement while simultan-
eously permitting healthy inmates to benefit and be released early
from incarceration after successful completion.  This manner of
operation demonstrates a deficient management of subordinates and
supervisor liability.

28.   NYSDOCCS administers a SHOCK Incarceration Program
(henceforth, SHOCK).  This program provides selected inmates a
special six month program of SHOCK incarceration, stressing highly
structured routine of discipline, intensive regimentation,
exercise, and work therapy, together with substance abuse
treatment; education, pre-release counseling, and life skills
counseling. The incentive for a successful completion of the six
month long SHOCK program is an early release from incarceration to
parole.

29.   Even when an inmate satisfies all of the eligibility
criteria for SHOCK candidacy, they must still undergo selection
into the program and may be deemed unsuitable if there exists a
serious medical or mental health problem.  However, court-ordered
SHOCK inmates whom have a serious medical or mental health prob-
lem are afforded an alternative placement so they may still bene-
fit as if they completed the SHOCK program.  This alternative

program focuses more on education and drug abuse prevention than
exercise and is named, C.A.S.A.T. (Comprehensive Alcohol & Sub-
stance Abuse Treatment), which is located at Hale Creek Correct-
ional Facility.

30.   NYSDOCCS Directive #2614, entitled "Reasonable Accom-
odations For Inmates With Disibilities", explains clearly in its
POLICY how a qualified inmate can still take advantage of a pro-
grams with a serious medical or mental health problem by stating
the following:  "Title II (Subtitle A) of the Americans With Dis-
ibilities Act (ADA) prohibits State and local entities from dis-
criminating against any qualified individual with a disibility in
their programs, services, and activities.  Therefore, the pro-
grams and services provided to inmates by this agency, or those
that may be contracted to other entities, must ensure accessib-
ility and usability by qualified inmates in the most integrated
settings.  The Department is required to make "reasonable accomm-
odations" or modifications to existing policies and procedures to
allow qualified inmates with disibilities the same opportunities
as non-disabled inmates, unless to do so would be an undue burden
to the Department, cause a fundamental alteration to a program,
or compromise the safety of the facility".  Therefore, there is a
direct contradiction between these two Directives and thus, the
current policy and procedure is unlawful.

31.   According to Directive #2614 (2)(B), reasonable
accommodations for inmates with disabilities may in-
clude, "any change in the environment, policies, procedures, or
the manner in which tasks are completed enables a qualified
individual with a disabiiity to participate in a program or
service".  Thus, only a change in policy is required so that

teer disabled inmates can participate and benefit from SHOCK'S alternative program in the same manner that court-ordered disabled inmates currently do.

32. This change in policy to allow volunteer, non court-ordered inmates to participate in SHOCK or its alternative program does not pose any "fundamental alteration" in that this alternative program (C.A.S.A.T.) is already in procedural operation for court-ordered inmates at Hale Creek Correctional Facility. Similarly, Directive #2614, entitled "Reasonable Accomodations For Inmates With Disibilities" states at II (D) : Undue Burden: "Reasonable Accomodations or modifications which would result in a fundamental alteration in the nature of a program or activity or in undue financial and administrative hardship. This is a limited exception under the ADA and generally cannot be used for denying an accomodation or a modification requested for program accessibility."

33. July 14, 2015: Plaintiff is sentenced to an indeterminite prison term of (3) to (6) years for the crime of non-violent 3rd Degree Robbery. The sentencing judge "recommends" the SHOCK program but does not order or mandate it.

34. July 24, 2015: Plaintiff departs from county jail and enters State custody at Ulster Correctional Facility (Reception Center). The Medical Department determine Plaintiff is unsuitable for the SHOCK program and stamp the word "SHOCK" on his medical chart and scrawl an "X" through it.

35. July 27, 2015: The Medical staff at Ulster Correctional Facility note in Plaintiff's medical records, "Not a SHOCK candidate", after screening and discovering numerous disibilit-

-9-

ies.  Inmates are given preliminary screenings at reception cen-
ters to determine if they meet statutory eligibility criteria
for participation in the SHOCK Incarceration Program.  From this
moment onward, Plaintiff is advised by the Medical Department of
NYSDOCCS that he will not be permitted entry into the SHOCK pro-
gram and benefit from the early release that a completion affords.
It is further explained to Plaintiff that even if he was granted
participation into the program, his health would be at risk of
an injury.  (

36.  July 27, 2015: The Office of Mental Health staff at
Ulster Correctional Facility assign a "Mental Health Services"
level of (3) to Plaintiff.  This classification level
automatic-ally excludes Plaintiff from the SHOCK program.

37.  September 10, 2015: Plaintiff obtained a "Medical Prob-
lem List" printed from the Health Services System of NYSDOCCS.
His "current classifications" of (1) for Medical and (3) for
O.M.H. (Office of Mental Health) both exclude him from SHOCK.  A
few of Plaintiff's disabilities include, "multiple cardiac risk
factors", "serious mental disorder", "epilepsy", and "heart dis-
ease".

38.  October 23, 2015: Despite being informed repeatedly by
the Medical Department that he is, "Not a SHOCK candidate",
Plaintiff is "offered" the SHOCK program.  Aware that participat-
ion would likely result in an injury, and careful to heed the
medical advice previously spoken, Plaintiff signed a "Voluntary
Declination" form.  There was no alternative program offered to
Plaintiff to accommodate his disabilities.

39.    February 19,2017:Plaintiff submits a "Request For Reasonable Accomodations" to participate in the SHOCK program since he is a qualified individual with a disibility; an individual with a disibility who, with or without reasonable mod-ifications to rules, policies, or practices, meets the essential eligibility for participation in programs or activities provided by a public entity. Plaintiff requested as an accomodation to the vigorous SHOCK program, the alternative placement that court-ordered inmates are afforded, due to his numerous serious medical problems.   The Assistant Deputy Superintendent of Programs, Laurie Fisher, denied Plaintiff's application by stating: "Admission to SHOCK Alternative Program is not a Reasonable Accomodation. SHOCK admission is based on screening performed by Guidance Unit and eligibility requirements." While it is true that reasonable acc-omodations are only extended to court-ordered disabled inmates and not volunteers, it is also a fact that an inmate with a dis-ibility may request a reasonable accomodation to any program at any

time during incarceration <u>without</u> having to be screened by Guid-
ance Unit, according to NYSDOCCS Directive #2614, page (2) of
(5), Section IV.  In fact, this is the very nature of the
Reason-able Accomodation Request process.

40.  <u>March 21, 2017</u>:  Plaintiff submits an "Inmate Grievance
Complaint" (GNE-9243-17) citing: "The decision to deny me
admission violates my right to be free from discrimination on the
basis of disibility and violates my rights under the Americans
With Disibilities Act"

41.  <u>March 21, 2017</u>: Plaintiff forwards a correspondence to
O.R.C. Welytok of the Guidance Unit, asking to be reconsidered for
the SHOCK program since the "Voluntary Declination" form that
he originally signed offers this opportunity.

42.  <u>April 10, 2017</u>: Plaintiff submitted a grievance to be
amended to the original (GNE-9243-17) because his O.R.C. Welytok
refused to respond to his request for reconsideration into the
SHOCK program.  The "Voluntary Declination" form offers Plaintiff
this provision.

43.  <u>April 24, 2017</u>: Plaintiff receives his grievance decis-
ion from Superintendent Smith (GNE-9243-17), entitled "Denied
SHOCK", which says in part: "SHOCK is not a reasonable accomodat-
ion".  This is only accurate because NYSDOCCS denies inmates with
disibilities from SHOCK program participation when they are not
court-ordered.  NYSDOCCS policy, as explained in the Pro Se
journal is being challenged by DRNY.  Interestingly, the
Superintendent now alleges Plaintiff is "ineligible" for SHOCK

-12-

program participation even though he meets all eligibility crit-eria except for being disabled.

44. Plaintiff is and was a qualified individual with a dasibility and eligible for participation in the SHOCK program otherwise, as defined by New York Correction Law § 865 and NYSDOCCS Directive #0086 entitled, "SHOCK Incarceration Facilit-ies".

45. May 23, 2017: Plaintiff receives an "Interdepartmental Communication" from Assistant Deputy Superintendent of Programs, Laurie Fisher, stating: "You are not eligible (for SHOCK) as follows: 1) You refused SHOCK in 2015  2) You can only be placed in the SHOCK alternative program if you are court-ordered into SHOCK (and disabled). You were not court-ordered". Plain-tiff did, indeed, initially "refuse" to participate in SHOCK af-ter he was advised by the Medical Department that he was, "Not a SHOCK candidate" and that enrollment without a reasonable accom-odation would be injurious. Furthermore, the "Voluntary Declin-ation" form that Plaintiff signed does allow him to be reconsid-ered after notifying his O.R.C., which he did. Secondly, it is an accurate assessment that Plaintiff was not court-ordered to SHOCK and that the SHOCK alternative program is not designed for volunteer disabled inmates. Non disabled volunteers are sent to SHOCK and court-ordered disabled inmates are granted the altern-ative program. Hence, the unlawful policy in denying disabled volunteers from benefiting from either program and the evident discrimination by its enforcers. (se

46. May 30, 2017: Plaintiff submitted a second grievance (GNE-9366-17); this one unrelated to the first and the one that

was amended to the first. This new grievance challenges the Superintendent's recent decision that Plaintiff was "ineligible", requests the alleged reasons, and asks to be reconsidered for the SHOCK program or its alternative.

47. May 30, 2017: After seeking clarification from his O.R.C. M. Noriega, Plaintiff receives a confusing "Interdepartmental Communication" that leaves him with even more questions than answers. Her correspondence states: "VFO (Violent Felony Override) done when you qualify for Temporary Release/ CASAT. SHOCK - most of the time is court order. Programs we have sent a copy!" Plaintiff does not have a violent felony conviction and nobody has been capable of deciphering what Ms. Noriega was re-ferring to with her comment.

48. June 5, 2017: Plaintiff submitted an amended grievance to be combined with the second on file (GNE-9366-17). This grievance disputes the reasons why O.R.C. M. Noriega alleged Plaintiff was ineligible for SHOCK.

49. UNDATED DOCUMENT: 83 N.Y. Jur. 2d Penal & Correctional Institution § 17, 18 outlines what SHOCK Incarceration consists of and indicates eligibility requirements. This material further proves that Plaintiff is and was an eligible inmate for the SHOCK program, although disqualified for disibility only.

50. July 24, 2017: Plaintiff signs a "SHOCK Incarceration Program Memo Of Agreement" form for participation into the program, although it was falsely alleged previously by numerous NYSDOCCS employees that he was ineligible for the program. NYSDOCCS Directive #2614, page (2) of (5), Section IV allows inmates to request a Reasonable Accomodation to any program or

-14-

service at any time during incarceration.  Therefore, Plaintiff attached a Reasonable Accomodation Request form with the SHOCK Memo Of Agreement.

51.  July 24, 2017: Plaintiff attaches a Reasonable Accomodation Request form with the SHOCK Memo of Agreement.  In responding, Dr. Smith states: "Please note current medical regimen precludes SHOCK".  Dr. Smith also documents "myoclonus/ seizure disorder" on the form.  The Assistant Deputy Superintendent of Program, Laurie Fisher's comment at the bottom does not make any sense and Plaintiff explains why in the grievance that he files afterwards.

52.  The impairment of myoclonus/ seizure disorder substant-ially limits one or more of Plaintiff's major life activities,including lifting and strenuous exercise; a record of such im-pairment is well documented.  Plaintiff was/ is a qualified in-dividual who meets the essential requirements for participation
in the SHOCK program, but has been prohibited entry.

53.  July 24, 2017: The SHOCK Screening Committee fill out a SHOCK Incarceration Suitability Screening Form and carefully de-ny Plaintiff the program for reasons of "UNSUITABLE-OTHER".  This form is conveniently left blank in many areas that would've ass-isted in proving Plaintiff was medically/ mentally unsuitable
due to disibility.  Plaintiff would grieve this denial.

54.  July 31, 2017: Superintendent Smith responds to griev-ance GNE-9366-17 by stating: "...It was already explained to Grievant previously that Alternative SHOCK is only mandated for court ordered SHOCK inmates when they are medically unable to

participate in the SHOCK program...".  Thus, non court-ordered
inmates whom are eligible but have a disibility cannot particip-
ate.  And, non court-ordered <u>healthy</u> inmates can volunteer and
attend SHOCK with no restrictions.  Disabled inmates, however,
cannot benefit from the program without a court-order.  Plaintiff
appealed this decision to the Central Office Review Committee
(henceforth, C.O.R.C.) for final disposition and to fully exhaust
his administrative remedies.

55.  <u>August 7, 2017:</u> A Memorandum from O.R.C. A. Rouse is sent
to Plaintiff explaining the three reasons for which it app-ears
Plaintiff was denied the SHOCK program.  These reasons in-clude
Instant Offense, Criminal History, and Psychiatric History.
Plaintiff's non violent instant offense cannot preclude him and
neither can his criminal history which does not contain a crime on
the list of exclusion.

56.  <u>August 9, 2017:</u> A "Program Eligibility Screening &
Mon-itoring Inmate Program Overview" is printed and mentions
Plain-tiff's reason for unsuitability as "OTHER".

57.  <u>August 14, 2017:</u> Plaintiff files his third grievance
(GNE-9484-17) because his O.R.C. refused to provide him with the
reason(s) for which he was assumed to be ineligible for SHOCK.

58.  <u>August 23, 2017:</u> Plaintiff submits grievance number
four (GNE-9507-17) which addresses another SHOCK/ Reasonable
Accomodation denial (of July 24, 2017), thereby demonstrating
aggravated acts of discrimination.  Plaintiff will again agree
to attend SHOCK when it is "offered" in the future, only to be

-16-

treated similarly.

59.  <u>August 28, 2017:</u> Elena Landriscina of Disibility Rights
contacts a Commissioner of Corrections and two Superintendents
of Greene C.F. to demand cooperation and compliance and informs
Plaintiff of her investigation.

60.  <u>September 13, 2017:</u> In an inmate Grievance Resolution
Committee hearing, concerning Grievance GNE-9507-17, the Comm-
ittee remarkable states: "Committee agrees that DOCCS should have
a medical alternative to SHOCK even if this requires changes to
State statute".  In order to exhaust his administrative remedies
and preserve his right to file a claim, Plaintiff appeals this
decision to the Superintendent and eventually the C.O.R.C. in
Albany.

61.  <u>September 26, 2017:</u> Superintendent Smith responds to
Grievance GNE-9484-17 in reference to being denied the specific
reasons for which Plaintiff was denied the SHOCK program.
"UN-SUITABLE-OTHER" did not clarify the reason(s).  It is
accurate that, "...(Plaintiff) did not agree to participate in
the pro-gram as presented", but rather exercised his right to
submit a Reasonable Accomodation Request form, pursuant to
NYSDOCCS Di-rective #2614, Section IV.  "As presented" would've
involved rigorous physical exertion that would've placed
Plaintiff's heal-th/ safety at risk of injury.  Plaintiff sought
the alternative placement in the C.A.S.A.T. program that court-
ordered inmates with disabilities attend, or another arrangement.

62.  <u>September 29, 2017:</u> Plaintiff is "offered" the SHOCK
program again and he signs another Memo Of Agreement but this
time he made it understood that he was not medically fit by

attaching a Reasonable Accomodation Request Form and medical
records.

63. September 29, 2017: Plaintiff attaches a Reasonable
Accomodation Request Form to the SHOCK Incarceration Memo Of
Agreement since he is a qualified individual with a disibility;
an individual who with or without reasonable accomodations to
rules, policies,or practices, meets the essential eligibility re-
quirements for participation in a program or activity provided by
a public entity. Dr. Smith inscribes on the form: "Please note
current medical condition precludes strenuous program activities.
Disibility well documented". As a result of there being no stat-
ute that allows for a disabled volunteer to enter SHOCK, the Dep-
uty Superintendent of Programs, Marie Hammond responds: "SHOCK
requires participants to engage in physical exercise and drills.
Inmate does not qualify for exemption from this requirement".

64. October 13, 2017: The SHOCK Screening Committee fill out
another SHOCK Incarceration Suitability Screening Form for the
second time and deny Plaintiff admission again; this time for
"UNSUITABLE-MEDICAL".

65. October 20, 2017: Superintendent Smith responds to
Grievance GNE-9507-17, pertaining to the July 24, 2017 SHOCK/
Reasonable Accomodation denials. However, due to the numerous and
frequent acts of disibility discrimination and subsequent
grievances, the Superintendent begins to combine the incidences
into one matter because they are of the same nature. Yet, each
denial is a seperate and distinct act.

~~realizes Plaintiff cannot benefit from this as he will be re-~~
~~leased from incarceration in December of 2018, and that Plaintiff~~
~~is solely concerned with being financially compensated for the~~
~~three years in excess that he served in prison. Therefore, she~~
~~closes Plaintiff's case. (see Ex. 34)~~

66. ___ October 23, 2017: Elena Landriscina of DRNY provides
Plaintiff with a copy of NYSDOCCS's Counsel's response to her re-
quest for answers about Plaintiff's SHOCK denials. Associate Coun-
sel states Plaintiff wasn't medically cleared. He adds: "Mr.
Goodall's conditions do not constitute a disibility as defined in
the Americans With Disibilities Act", but later admits Plaintiff's
medical condition would excuse him from "virtually the entire pro-
gram" because of the activities involved. Dr. Smith already doc-
umented "disability well documented" but this fact aside, the ADA
Amendment Act of 2008 focuses more on whether or not an entity
meets obligations to disabled prisoners, rather than solely foc-
using on whether the impairment is a disibility, Counsel men-
tions that a fundamental alteration of the program would be need-
ed to accomodate Plaintiff but fails to relate that there is al-
ready an alternative to SHOCK called C.A.S.A.T. and only a change
in policy is needed for Plaintiff to engage in the program. This
would also eliminate any potential financial burden on the ad-
ministration. Lastly, even if the Defendants could show that

changes would fundamentally alter the program, or cause a fin-
ancial burden, the law mandates prisons to still "take another
action" that would "ensure that individuals with disibilities re-
ceive the benefits or services provided" by the prisons.  NYSDOCCS
and by extension, its employees, failed to abide by the law.
These examples alone testify to the truth that only a change in
policy is required to reverse the trend of discrimination.

67.  October 27, 2017: After waiting for the completed

Reasonable Accomodation Request form from the Deputy
Superintendent of Programs and the decision from the SHOCK
Screening Committee,Plaintiff files his final grievance
(GNE-9608-17) about being de-nied SHOCK again.

68.  December 20, 2017: Superintendent Smith responds to
Plaintiff's final grievance (GNE-9608-17) and it is appealed to
the C.O.R.C. in Albany to fully exhaust administrative remedies.

69.  December 23, 2017: Plaintiff mailed a Notice Of Intent-
ion To File A Claim on the Attorney General within (90) days of
the accrual of the last incident of discrimination in the event
this venue is chosen.

70.  July 5, 2017: The C.O.R.C. responds to the first of num-
erous grievances (GNE-9243-17) at the final stage of the appeal
process.  Naturally, all of Plaintiff's allegations are refuted.

71.  The C.O.R.C. is currently in possession of the four un-
answered grievances that are scheduled for a hearing, although

the maximum allotted timeframe of (30) days to render a final decision has grossly exceeded this timeframe.

## VI. EXHAUSTION OF ADMINISTRATIVE REMEDIES

72.  Plaintiff used the Inmate Grievance Program (henceforth, I.G.P.) procedure available at Greene C.F. to attempt to resolve the discrimination on (5) seperate occasions as there were (5) individual commissions against Plaintiff.  Plaintiff filed his first grievance (GNE-9243-17) on March 21, 2017, and presented the facts related to the claim.  On April 10, 2017, Plaintiff am-ended this grievance and it was consolidated.  On April 24, 2017, Plaintiff was sent a response from the Superintendent, explaining his grievance was denied.  On April 27, 2017, Plaintiff appealed the denial to the C.O.R.C. in Albany for final disposition and to exhaust administrative remedies.  On July 5, 2018, the C.O.R.C. unanimously denied Plaintiff's first of five grievances.

73.  Plaintiff again used the I.G.P. procedure available at Greene C.F. to attempt to resolve the on-going discrimination by filing his second of five grievances (GNE-9366-17) on May 30, 2017, which presented the facts related to his claim.  On June 5, 2017, Plaintiff amended this grievances and it was consolidat-ed. On July 31, 2017, Plaintiff was sent a response from the Superintendent explaining his grievance was denied.  On August 1, 2017, Plaintiff appealed the denial to the C.O.R.C. for final

disposition and to exhaust his administrative remedies.  NYSDOCCS Directive #4040 reveals the policy which allows the C.O.R.C. (30) days to render a final decision.  This grievance was received by the C.O.R.C. on August 10, 2017, but a timely decision has been delayed due to an alleged influx of grievances by inmates.

74.  Plaintiff again used the I.G.P. procedure available at Greene C.F. to attempt to resolve the on-going discrimination by filing his third of five grievances (GNE-9484-17) on August 14, 2017, which presented the facts related to his claim.  On September 26, 2017, Plaintiff received a response from the Superintendent, explaining his grievance was affirmed to an extent.  On September 28, 2017, Plaintiff appealed this decision to the C.O.R.C. for a final decision.  This grievance was received by the C.O.R.C. on November 28, 2017, but a timely decision has been delayed due to an alleged influx of grievances by inmates.

75.  Plaintiff again used the I.G.P. procedure available at Greene C.F. to attempt to resolve the on-going discrimination by filing his fourth of five grievances (GNE-9507-17) on August 23, 2017, which presented the facts related to his claim.  On September 13, 2017, Plaintiff received a hearing on his grievance, which was partly accepted.  On September 14, 2017, Plaintiff appealed this decision to the Superintendent.  On October 20, 2017, Plaintiff was sent a response from the Superintendent, explaining his grievance was denied.  On October 24, 2017, Plaintiff appealed the denial to the C.O.R.C. in Albany for a final disposition and to exhaust administrative remedies.  This grievance was re-

-22-

disposition and to exhaust his administrative remedies.  NYSDOCCS
Directive #4040 reveals the policy which allows the C.O.R.C. (30)
days to render a final decision.  This grievance was received by
the C.O.R.C. on August 10, 2017, but a timely decision has been
delayed due to an alleged influx of grievances by inmates.

74.  Plaintiff again used the I.G.P. procedure available at
Greene C.F. to attempt to resolve the on-going discrimination by
filing his third of five grievances (GNE-9484-17) on August 14,
2017, which presented the facts related to his claim.  On Sep-
tember 26, 2017, Plaintiff received a response from the Superin-
tendent, explaining his grievance was affirmed to an extent.  On
September 28, 2017, Plaintiff appealed this decision to the
C.O.R.C. for a final decision.  This grievance was received by the
C.O.R.C. on November 28, 2017, but a timely decision has been
delayed due to an alleged influx of grievances by inmates.


75.  Plaintiff again used the I.G.P. procedure available at
Greene C.F. to attempt to resolve the on-going discrimination by
filing his fourth of five grievances (GNE-9507-17) on August 23,
2017, which presented the facts related to his claim.  On Sep-
tember 13, 2017, Plaintiff received a hearing on his grievance,
which was partly accepted.  On September 14, 2017, Plaintiff app-
ealed this decision to the Superintendent.  On October 20, 2017,
Plaintiff was sent a response from the Superintendent, explaining
his grievance was denied.  On October 24, 2017, Plaintiff appeal-
ed the denial to the C.O.R.C. in Albany for a final disposition
and to exhaust administrative remedies.  This grievance was re-

ceived by the C.O.R.C. on November 28, 2017, but a timely decis-
ion has been delayed due to an alleged influx of grievances by
inmates.  (see Ex.26, Ex.28, Ex.33, Ex.40)

76.  Plaintiff again used the I.G.P. procedure available at
Greene C.F. to attempt to resolve the on-going discrimination by-
submitting his fifth of five grievances (GNE-9608-17) on October
27, 2017, which presented the facts related to his claim.  On
December 20, 2017, Plaintiff was sent a response from the Super-
intendent, explaining his grievance was affirmed to an extent.
On December 23, 2017, Plaintiff appealed this decision to the
C.O.R.C. in Albany for final disposition and to exhaust his ad-
ministrative remedies.  This grievance was received by the
C.O.R.C. on February 2, 2018, but a timely decision has been de-
layed due to an alleged influx of grievances by inmates.  (see
Ex.36, Ex.37, Ex.40)


## VII. STATEMENT OF LEGAL CLAIMS


77.  Plaintiff realleges and incorporates by reference, para-
graphs (1) to (78).

78.  All of the Defendants have committed, contributed to,
and willfully demonstrated aggravated disibility discrimination
against Plaintiff by denying him participation in a (early re-
lease from incarceration) program without reasonable accomodat-
ions, while he was a qualified individual with a disibility,
thereby prohibiting Plaintiff from benefiting; and in doing so,

-23-

violated his rights the Americans With Disabilities Act, Title II, and New York State Human Rights Law, resulting in loss of liberty interests/ freedom, pain and suffering, and emotional distress.

79.   The Defendants' actions interfered with and violated Plaintiff's statutorily protected Federal rights and State rights, resulting in conditions of confinement that were worse than what was normal for other prisoners.   This punishment, received by Plaintiff, was an atypical and significant hardship on Plaintiff in relation to the ordinary incidences of prison life, whereby Plaintiff was deprived of the basic human need of liberty and justice.

80.   Any defense that supports the notion that prisons do not have to make modifications to a service, program, or activity if doing so would "fundamentally alter the nature of the service, program, or activity" This allows prisons to balance the rights of disabled prisoners against the integrity of its service, pro-gram, or activity.   Again, NYSDOCCS has shown with their pro-vision to allow disabled court-ordered SHOCK prisoners into its SHOCK alternative C.A.S.A.T. program that there is no fundamental alteration needed; just a change in policy to permit non court-

ordered volunteer prisoners whom are disabled and meet eligibility requirements.

81.   Any defense that supports the notion that prisons do not have to make modifications to a service, program, or activity if

doing so would "cause undue financial or administrative burden":
The Department of Justice has determined that the undue burden
test would be difficult for a prison to pass - that it would app-
ly only in "the most unusual cases".  "Congress intended the 'un-
due burden' standard in Titl II to be significantly higher than
the 'readily available' standard in Title III, and that "the pro-
gram assessibility requirement of Title II should enable individ-
uals with disibilities to participate in and benefit from the
service, program, or activity of public entities in all but the
most unusual cases".  But the most plain evidence that no finan-
cial burden would exist lays in the fact that several SHOCK al-
ternative programs are already in procedural operation - females
benefit from the C.A.S.A.T. program at Bedford Hills as due court-
ordered male prisoners.  A change in policy to allow volunteer
disabled prisoners is the only hinderance in preventing particip-
ation.


## VIII. PRAYER FOR RELIEF


—————————————————


82.  WHEREFORE, Plaintiff respectfully prays that this Court
enter judgment granting Plaintiff:

83.   A declaration that the acts and omissions described herein violated Plaintiff's rights under the Americans with Disabilities Act and the New York Human Rights Law.

87.   Compensatory damages in the amount of $3,000,000 against each Defendant jointly and severally.

88.   Punitive damages in the amount of $2,000,000.

89.   A jury trial on all issues triable by jury.

90.   Plaintiff's costs in this suit.

91.   Any additional relief as this Court deems just, proper, and equitable.


Dated: January _23_ , 2019

    Central Islip, New York

Respectfully Submitted,

_Shaun Goodall_

Shaun Goodall

15 Koren Lane
Middle Island
New York 11953
} no mail received here

Mailing Address of :

Shaun Goodall
Post Office Box 48
Wantagh, New York 11793

-26-